Eugene N. YANEK, et al., Plaintiff(s),

v.

STAAR SURGICAL COMPANY, et al., Defendant(s).

Roy Russell, Plaintiff,

v.

Staar Surgical Company and David Bailey, Defendants.

Susan L. Rubin, Plaintiff,

v.

Staar Surgical Company and David Bailey, Defendants.

No. CV 04–8007 SJO(CWX), CV 04–8263 SJO(CWX), CV 04–8613 SJO(CWX).

United States District Court, C.D. California.

Sept. 19, 2005.

Peter Binkow, Robin B. Howald and Avi Wagner of Glancy Binkow and Goldberg LLP, for plaintiff.

Dan Marmalefsky and Mark McDonald of Morrison & Foerster, Los Angeles, CA, for the defendant.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

OTERO, District Judge.

This matter is before the Court on Defendants STAAR Surgical Company ("STAAR" or "the Company") and David Bailey's Motion to Dismiss Plaintiffs' (Yanek, et.al.) Consolidated Complaint pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. The Court deemed this matter appropriate for decision without oral argument. *See* Fed.R.Civ.P. 78. Accordingly, the Court took the hearing off calendar. Having carefully considered all argument and admissible documentation submitted, Defendants' Motion to Dismiss is DENIED.

## I. FACTUAL BACKGROUND

Defendant STAAR Surgical Company develops, manufactures, and distributes products used by ophthalmologists and other eye care professionals to improve or correct vision in patients with cataracts, refractive conditions and glaucoma. Consolidated Class Action Complaint (hereinafter "CC") ¶ 24; STAAR Form 10–K filed Apr. 3, 2003, Defs. STAAR and David Bailey's Req. for Judicial Notice in Supp. of Mot. to Dismiss ("RJN") Ex. 2 at 19. STAAR's products include foldable silicone and Collamer Intraocular Lenses ("IOL"), used after cataract extraction surgery, and Implantable Contact Lenses ("ICL"). STAAR Form 10–K filed Apr. 3, 2003, RJN Ex. 2 at 19. STAAR's ICL is implanted in front of the natural lens of the eye and works in conjunction with the lens to correct refractive disorders such as myopia (nearsightedness), hyperopia (far-sightedness), and astigmatism. Id. at 25. Prior to the start of the Class Period,[1] the Company's ICLs were sold internationally and had gained approval in Canada, Korea and in the European Union. Id. at 26; The Wall Street Transcript article dated March 17, 2003 ("TWST Article"), RJN Ex. 1 at 10, 26. The ICL is classified by the Food and Drug Administration ("FDA") as a "Class III" medical device, which the FDA defines as "life-supporting ... of substantial Importance in preventing impairment of health, or present[ing] a potential unreasonable risk of illness or injury." CC ¶ 29. Class III devices are the most extensively regulated category of devices. Id.

### A. Class Period Events

During the Class Period, STAAR focused on obtaining FDA approval of its ICL on an expedited basis, with the objective of being the first to market such a device in the United States. See CC ¶¶ 25, 27–28; TWST Article, RJN Ex. 1 at 11; STAAR July 1, 2003 Press Release, RJN Ex. 7 at 102. STAAR's stock price rose significantly as the company gained the attention of investors and its ICL began to make significant progress towards gaining FDA pre-market approval.

On the first day of the Class Period, March 17, 2003, The Wall Street Transcript published an interview with Defendant David Bailey, the President and CEO of STAAR, which emphasized both the ICL's potential and the importance of the ICL to STAAR's future. CC ¶¶ 32–34. Plaintiffs aver that the market responded by sending STAAR stock up 6.5% the same day to close at $5.40 a share, and that the stock further increased by nearly 14% after a favorable report by analyst firm Adams, Harkness & Hill. CC ¶¶ 35–37. According to Plaintiffs, STAAR's stock jumped another 9% after an Apr. 14, 2003 STAAR press release detailing the conclusion of a highly positive three-year follow-up study, which showed that 99.4% of patients were satisfied with the ICL three years after implantation. See CC ¶ 40; RJN Ex. 3 at 91. Plaintiffs allege that STAAR's stock further increased after the release of STAAR's first quarter financial statement on May 1, 2003, showing a large increase in international sales of the ICL. CC ¶¶ 42–43.

On May 8, 2003, Defendants formally completed their pre-market approval application with the FDA. CC ¶ 45, Defs. STAAR and David Bailey's Notice of Mot. and Mot. to Dismiss Pls.' Consolidated Class Action Compl. and Supp. Mem. of P. & A. (hereinafter "Mot. to Dismiss") at 2.

---

1. The "Class Period" begins on March 17, 2003, and ends on Jan. 20, 2004. See CC ¶¶ 32, 70, 71.

On May 15, 2003, STAAR published a press release detailing a one-year follow-up study published in *Cornea, the Journal of Cornea and External Disease,* finding that the ICL consistently outperformed LASIK when performance was measured by several criteria. RJN Ex. 6 at 100–101.

Subsequently, on July 1, 2003. STAAR announced that the FDA had granted the ICL expedited review status. RJN Ex. 7 at 102–103. Plaintiffs aver that these developments ultimately sent STAAR stock as high as $14.17 a share at the close of the market on July 2, 2003. CC ¶ 50.

Pursuant to the FDA's expedited review of the ICL device, FDA inspectors performed an on-site inspection of STAAR's Monrovia manufacturing facilities from Aug. 12, 2003 through September 4, 2003. CC ¶ 55, Mot. to Dismiss at 2–3. At the close of the inspection, on September 4, 2003, the FDA issued a Form 483 "Notice of Observations" detailing "significant objectionable conditions" observed during the inspection. CC ¶ 55; FDA Investigations Operations Manual § 512.001, RJN Ex. 23 at 461–462.

Though STAAR provided a written response to the FDA's concerns on September 29, 2003, it did not notify investors of the inspection, the FDA's findings, or of its written response. CC ¶ 56; Mot. to Dismiss at 8–11.

In an Oct. 6, 2003 press release, STAAR announced that an FDA Advisory Panel had examined the available clinical data and recommended approval of the ICL. RJN Ex. 9 at 154–155. Plaintiffs do not assert that this last press release had any effect on the stock price.

Plaintiffs assert that between Dec. 3, 2003 and Dec. 11, 2003, the FDA conduct-ed a second inspection related to STAAR's ICL. CC ¶ 63.

Finally, on January 6, 2004, the FDA posted a Warning Letter on its website, dated December 22, 2003 and addressed to Defendant Bailey. CC ¶ 66. The Warning Letter disclosed the problems that had been observed during the Aug. 2003 inspection, and noted in the earlier Form 483 Notice of Observations. *See* FDA Warning Letter, RJN, Ex. 14 at 255–257. The FDA found that STAAR had violated Quality System and Current Good Manufacturing Practice ("CGMP") regulations because it: (1) failed to perform root cause analysis of complaints involving malfunctions in its IOL products; and (2) failed to validate the methods used to test raw materials and finished devices. *See id.;* STAAR Jan. 20, 2004 Press Release, RJN Ex. 17 at 261. The letter also stated that STAAR violated Medical Device Reporting ("MDR") requirements by failing to develop, maintain or implement written MDR procedures for reporting such product-related injuries or malfunctions—and failing to file incident reports with the FDA for serious injuries or malfunctions attributed to the IOL/ICL.[2] FDA Warning Letter, RJN Ex. 14 at 256.

The FDA emphasized in its Warning Letter that the ICL would not be approved until the violations had been addressed. *See* FDA Warning Letter, dated Dec. 22, 2003, RJN Ex. 14 at 256. According to Plaintiffs, on January 6, 2005, the day that the Warning Letter was posted on the FDA website, STAAR's stock dropped 18% below the previous day's close. CC ¶ 67. Plaintiffs assert that Defendants did not acknowledge the risks posed by the FDA noncompliance in STAAR's January 7, 2004 press release,

---

2. Plaintiffs concede that the reported violations of MDR regulations and failure to perform "root cause analysis" concerned primar-ily the IOL product, not the ICL. CC ¶ 55; STAAR Press Release dated Jan. 20, 2004, RJN Ex. 17 at 261.

and only acknowledged these risks in a press release dated January 20, 2004, the last day of the Class Period. CC ¶¶ 68–70.

### B. *Post–Class Period Events*

Plaintiffs aver that on April 23, 2004, the FDA issued a second Warning Letter concerning the Company's manufacturing facilities and practices. CC ¶ 72. Subsequently, Plaintiffs aver that on September 28, 2004, Defendants filed a Form 8–K indicating that the FDA compliance issues were more serious than previously disclosed, and that FDA corrective action was a possibility. CC ¶ 73. According to Plaintiffs, the impact of this news on the Company's stock was "swift and severe," and STAAR stock declined more than 38% in one day following the disclosures in the 8–K. CC ¶ 74.

### II. *LEGAL STANDARD*

Dismissal of a claim under Rule 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *See Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir.1999); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a 12(b)(6) motion, the court must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *See Big Bear Lodging Ass'n*, 182 F.3d at 1101; *American Family Ass'n Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir.2002). However, a court need not accept as true unreasonable inferences or conclusory legal allegations. *Western Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

### III. *DISCUSSION*

Plaintiffs bring claims against both Defendants under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b–5. Plaintiffs also bring a claim against Defendant Bailey under § 20(a) of the Exchange Act.

Defendants argue that Plaintiffs' securities fraud claims fail for several reasons. First, they claim Plaintiffs fail to identify and explain why STAAR's disclosures were materially false or misleading. Second, according to Defendants, the allegedly false or misleading statements are not actionable under § 10(b) because they are "forward looking" statements immunized under the PSLRA's Safe Harbor provision. Third, Defendants contend that even if their "forward looking" statements are actionable, the Safe Harbor provision still requires Plaintiffs to allege facts raising a strong inference that STAAR acted with an *actual intent* to deceive investors. Defendants claim Plaintiffs have not alleged such facts. Defendants also argue that Plaintiffs have not alleged a causal connection between their economic losses and Defendants' alleged misrepresentation. Lastly, Defendants claim that Plaintiffs have not pled a claim under § 20 of the Exchange Act because they have not pled a "primary violation" under § 10 of the Act or under SEC Rule 10b–5.

### A. *Plaintiffs State a Claim Under Exchange Act § 10(b) and SEC Rule 10b–5.*

Section 10(b) of the Exchange Act of 1934 states: "It shall be unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under the authority of § 10(b), extends liability to any person who "make[s] any untrue statement

of a material fact" or "omit[s] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

■ Congress raised the pleading standards for private securities fraud claims by enacting the PSLRA. *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999)(*en banc*). Under the PSLRA, Plaintiffs must plead the elements of a private securities suit with particularities that gave rise to the action, 15 U.S.C. § 78u–4(b), as well as adequate "corroborating details" and facts to support their allegations. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 942. If any element of a claim for securities fraud has not been properly pled, "the [C]ourt *shall,* on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u–4(b)(3)(A) (emphasis added).

1. *Plaintiff Meets the PSLRA's Requirement That Alleged Misrepresentations Be Pled with Particularity.*

■ Defendants assert that the Plaintiffs do not satisfy the PSLRA's demand that allegations of false or misleading statements be plead with specificity. Under the PSLRA, if a plaintiff alleges that the defendant made a misrepresentation or omission of material fact, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In particular, Defendants claim that in the portion of the

Consolidated Complaint dealing with the first half of the Class Period, "Plaintiffs do not identify any particular statements in those several, lengthy disclosures as false or misleading." Mot. to Dismiss at 5.

■ Paragraphs 32–34, 38, 40, 42–43, 46, 49, and 51 of the Consolidated Complaint contain a narrative describing events and Defendants' public statements in the first half of the Class Period, from March 17, 2003 through July 31, 2003. Defendants are correct that Plaintiffs fail to *individually* specify each statement alleged to have been misleading in this part of the Consolidated Complaint. Plaintiffs aver simply that "Defendants' statements in [the paragraphs listed] above were materially false and misleading and omitted material facts." CC ¶ 52. However, Plaintiffs indicate in their Opposition that false or misleading statements in these paragraphs are identified in bold text. Lead Pls. Mem. of Law in Opp'n. to Defs.' Mot. to Dismiss (hereinafter "Opp'n") at 8 & n.16. Also, Plaintiffs sufficiently allege that these statements are misleading because Defendants failed to disclose problems with their manufacturing facilities and the impediment they posed to obtaining FDA approval of the ICL. *See id.* Plaintiffs adequately identify which statements they allege to be misleading, and provide the reasons why they are misleading.[3] While Plaintiffs should have identified more clearly the statements they allege to be false or misleading, they have done so sufficiently to satisfy the PSRLA.

Defendants contend that Plaintiffs fail to meet the particularity requirement of the PSLRA because Defendants' public statements during the Class Period are in fact not false or misleading at all. However, because " 'falsity and scienter in private securities fraud cases are generally strong-

---

3. Statements made by third parties, such as market analysts, *see, e.g.,* ¶¶ 36–37, ¶¶ 43–44, are not statements made by Defendants.

Thus, the statements in ¶ 43 are not grounds for a securities fraud claim against Defendants.

ly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA," *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir.2002) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)), Defendants' second argument is more properly addressed in the Court's analysis of scienter.

### 2. The PSLRA's Safe Harbor Provision Does Not Apply to Defendants' Statements.

■ Under the PSLRA's "safe harbor" provision, certain "forward-looking statements" are not actionable under federal securities laws. 15 U.S.C. § 78u–5. Examples of "forward-looking statements" include "a projection of revenues," "a statement of the plans and objectives of management ... including plans or objectives relating to the products or services of the issuer [of securities]," and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." 15 U.S.C. § 78u–5(i)(1)(A)–(C). Plaintiffs do not dispute that many of the public statements made by Defendants in SEC filings, press releases, conference calls, and interviews are forward-looking in nature. Defendants' statements regarding the revolutionary potential of the ICL, the impor-

tance of the ICL to STAAR's financial prospects, and the lucrative United States market for the ICL qualify as "statement[s] of the plans and objectives of management," statements "related to the products or services" of STAAR, or "statement[s] of future economic performance." Defendants' statements projecting FDA approval by the end of 2003 and predicting a 2004 product launch for the ICL are also forward-looking.

■ Defendants assert that they are not liable for their forward-looking statements because those statements are protected by the PSLRA's safe harbor provision. That provision immunizes any forward-looking statement that is "(i) identified as a forward-looking statement, and ... accompanied by *meaningful* cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial." 15 U.S.C. § 78u–5(c)(A) (emphasis added).[4] While the word "meaningful" is not further defined, any cautionary language must adequately disclose both the risks involved and the assumptions upon which the optimistic, forward-looking language is based. *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1413 (9th Cir.1994) (citing with approval *In re Worlds of Wonder Securities Litigation*, 814 F.Supp. 850, 859 (N.D.Cal.1993)).[5]

---

4. The Court notes in passing Plaintiffs' argument that "determining the adequacy of [Defendants' cautionary statements] is inappropriate at this stage of the case." Because applicability of the Safe Harbor is a determination of law, not one of fact, this determination is appropriate on a Motion to Dismiss. The PSLRA requires that forward-looking statements that fall within its safe harbor provision "shall not" be actionable under federal securities laws. 15 U.S.C. § 78u–5(c)(1). *Accord Clorox*, 353 F.3d at 1132 (explaining the bespeaks caution doctrine, upon which the PSLRA's safe harbor is modeled, is a determination of law.) Plaintiffs' authority, *Asher v.*

*Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), suggests only that the applicability of the statutory Safe Harbor cannot always be determined on the pleadings. It does not require that the safe harbor determination be subject to discovery in all Seventh Circuit cases, much less in all Ninth Circuit cases.

5. Because *Worlds of Wonder* is a pre-PSLRA case, it actually concerns the common law "bespeaks caution" doctrine. However, the PSLRA's Safe Harbor provision is a statutory codification of this doctrine. *Employers Teamsters Local Nos. 175 and 505 Pension*

The cautionary language in STAAR's press releases is inadequate. All STAAR press releases contained the following cautionary language: [6]

All statements in this press release that are not statements of historical fact are forward-looking statements .... These statements are based on expectations and assumptions as of the date of this press release and are subject to numerous risks and uncertainties, which could cause actual results to differ materially from those described in the forward-looking statements. The risks and uncertainties include the need to obtain regulatory approval for new products, acceptance of new products by medical practitioners and consumers, the rapid pace of technological change in the ophthalmic industry, general domestic and international economic conditions, and other factors beyond the control of STAAR Surgical Company.

STAAR May 1, 2003 press release, RJN Ex. 4 at 93–96. While this language identifies some factors that "could cause actual results to differ materially" from those in any forward-looking statements, the cautionary statement taken as a whole is not "meaningful." The risks associated with the "acceptance of new products" by consumers and "general domestic and international economic conditions," for instance, are factors that are so broad that they apply to *any* business that sells products to consumers. Furthermore, the phrase "the need to obtain regulatory approval for new products" inadequately identifies risks related to the FDA approval of the ICL. Here, the factors enumerated do not adequately disclose the actual risks involved,

and do not invoke the protection of the safe harbor provision.

█ Similarly, the cautionary language in STAAR's 2003 Form 10–K filing with the SEC does not immunize any forward-looking statements made in that document. The cautionary portion of the 10–K states, among other factors, that "[t]he FDA approval process is typically lengthy and expensive, and approval is never certain", and that "[n]oncompliance with applicable United States regulatory requirements can lead to ... denial or withdrawal of pre-marketing approvals." STAAR's Form 10–K, filed Apr. 3, 2003, RJN Ex. 2 at 15, 46–47; Mot. to Dismiss at 15–16. While more thorough than the language included in the press releases, this cautionary language does not meaningfully address the risks related to STAAR's pending FDA approval. In particular, it does not discuss any factors related to its existing manufacturing facilities, such as the risk that non-compliance with the FDA's Medical Device Reporting regulations for one product could hold up the pre-market application submission for another product. *See* FDA Warning Letter, RJN Ex. 114 at 255–256. Furthermore, as Plaintiffs note, the cautionary language in STAAR's 10–K can apply to "literally any issuer subject to FDA regulation." Opp'n at 18. If it were meaningful, "[n]o company would ever have to truthfully discuss its operations," *id.*, because every company would be able to preclude liability for statements concerning FDA approval of its products.

█ Finally, none of Defendants' oral forward-looking statements during STAAR conference calls are immunized by the safe harbor.[7] The PSLRA immunizes

---

*Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1132 (9th Cir.2004).

**6.** STAAR's April 14, 2003 press release reporting the release of Dr. Slade's three year patient satisfaction follow-up study, RJN Ex. 3 at 91–92, contains no safe harbor language.

**7.** Defendant Bailey's oral forward-looking statements in his March 17, 2003 interview with The Wall Street Transcript are not linked to any written document such as an SEC filing, and are thus not covered under the safe harbor.

an oral forward-looking statement if it is accompanied by other cautionary oral statements, including a statement that identifies a written document, such as an SEC filing, that discuss important factors that could cause actual results to materially differ from those in the oral forward-looking statement. 15 U.S.C. § 78u–5(c)(2).[8] STAAR's public conference calls referred listeners to "factors that may affect actual results ... detailed in the company's filings [with] the SEC including its most recent filing of Form 10Q and 10K." *See, e.g.*, STAAR Form 8–K filed on Aug. 6, 2003, Ex. 99–2, RJN Ex. 8 at 104, 118. However, the cautionary language in STAAR's 2003 Form 10–K does not contain a "meaningful" identification of risk factors, and Defendants do not point to any other written document containing cautionary language that may be "meaningful." Thus, the PSLRA's safe harbor provision does not cover STAAR's oral forward-looking statements.

3. *Plaintiff Meets the PSLRA's Requirement That Scienter Be Pled with Particularity.*

▮ Under the PSLRA, a complaint shall, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind is, at a minimum, deliberate recklessness. *Silicon Graphics*, 183 F.3d at 979. However, the standard for showing scienter is higher

where a defendant has made forward-looking statements that are not immunized by the safe harbor provision. The PSLRA's safe harbor requires that a plaintiff show that forward-looking statements made by an individual were made "with *actual knowledge* by that person that the statement was false or misleading," or, if made by a business entity, "(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with *actual knowledge* by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B) (emphasis added).

▮ In general, the Court must "review[ ] the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir.2002). The Court "consider[s] *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the [P]laintiffs." *Id.* at 897 (emphasis in original.) Plaintiffs claim that the omission of any discussion of potential FDA compliance problems from Defendants' public statements demonstrates an actual intent to deceive. CC ¶¶ 52–54. According to Plaintiffs, those statements were materially false and misleading both before and after the FDA issued its Notice of Observations in early Aug. 2003. *Id.*; CC ¶¶ 57–59, 61–62. Plaintiffs also allege that STAAR's "history of recalls," Opp'n at 4–5, suspicious stock sales by STAAR officers and em-

---

**8.** For the safe harbor to apply to an oral forward-looking statement, the statement must be accompanied by a cautionary oral statement that (1) notes that the particular oral statement is a forward-looking statement; and (2) notes that actual results might differ materially from those projected in that statement. 15 U.S.C. § 78u–5(c)(2)(A). In addition, the forward-looking statement must be accompanied by another oral statement that

additional information concerning factors that could cause actual results to materially differ (1) is contained in a readily available written document or a portion thereof; (2) that document or portion thereof is identified; and (3) the information contained in that document is a cautionary statement satisfying the standard established in 15 U.S.C. § 78u–5(c)(1)(A) for ordinary, written forward-looking statements. 15 U.S.C. § 78u–5(c)(2)(B).

ployees, CC ¶ 48, and STAAR's private placement of a million shares of stock, CC ¶¶ 83–85, provide additional circumstantial evidence of scienter.

### a. *Falsity and Scienter Constitute a Unitary Inquiry Under the PSLRA.*

 The inquiry into scienter is combined with the inquiry for falsity, as the two are generally strongly inferred from the same set of facts. *Vantive,* 283 F.3d at 1091. Defendants contest falsity separately from scienter. They argue that none of their statements were false or misleading because Rule 10b–5 "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir.2002) (emphasis in original). In order to be considered misleading, *Brody* held that an incomplete statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." [9] *Id.* However, *Brody* does not create a standard for determining falsity distinct from the standard for scienter. Rather, Plaintiffs must plead scienter with particularity to satisfy the requirements of *Silicon Graphics* and the PSLRA. *Pathogenesis,* 284 F.3d at 1035 n. 14.

### b. *Plaintiffs' Allegations Concerning Defendants' Statements from March 17, 2003 through July 31, 2003 Do Not Demonstrate Scienter.*

 Plaintiffs assert Defendants' public statements from the beginning of the Class Period on March 17, 2003 through July 31, 2003 (the "Early Class Period") were false and misleading because they failed to mention problems with Defendants' manufacturing facilities that could jeopardize timely FDA approval of the ICL. CC ¶ 52. Plaintiffs point to Defendants' Early Class Period statements promoting ICL technology, *see* CC ¶ 34 ("we believe the ICL could offer a superior alternative for some 10 million patients in the US"), CC ¶ 49 ("We have always asserted that the ICL would represent the next paradigm shift in refractive surgery and consider the granting of expedited review status by the FDA an underscore of this belief"); and predicting prompt FDA approval, *see* CC ¶ 34 ("we expect FDA approval for the myopic version by year's end," "we would hope for approval this year"). Plaintiffs also assert that Defendants' statements concerning the importance of the ICL to the Company, *see* CC ¶ 42 ("when approved the ICL continues to present the most significant opportunity for long-term growth") are false and misleading.

Plaintiffs argue that during the Early Class Period, Defendants "knew, or should have known" that the FDA would conduct an inspection of STAAR's facilities as part of the FDA approval process for the ICL, and that any violations of FDA regulations would pose an impediment to regulatory approval. CC ¶ 52. Plaintiffs assert that Defendants had a "duty to monitor" their manufacturing facilities and thus "were presumptively aware of deficiencies in

---

9. Materiality is a basic requirement of a § 10(b) that is not contested by Defendants. Rule 10b–5 requires that an omission or false statement concern a "material" fact in order to be actionable. 17 C.F.R. § 240.10b–5. An omitted fact is "material" in this context if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Here, the fact that FDA approval of the ICL could be delayed by STAAR's noncompliance with FDA regulations is a material fact that would significantly alter the "total mix" of publicly available information.

STAAR's manufacturing." Opp'n at 10 (citing *In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936, at *3 (N.D.Cal. May 25, 2000)). Plaintiffs cite no Ninth Circuit law to support their proposition. In addition, the PSLRA requires a "strong inference" of *actual* knowledge, and not merely constructive knowledge, that a forward looking statement was false. 15 U.S.C. § 78u–4(b)(2); 15 U.S.C. § 78u–5(c)(1)(B)(i). Plaintiff's allegations do not show that Defendants made the contested forward-looking statements with actual knowledge of their falsity. As Defendants observe, Plaintiffs do not allege any facts showing that, at the time Defendants made their forward-looking statements, FDA compliance problems existed, Defendants actually knew of these problems, or that these problems would preclude FDA approval of the ICL. These Early Class Period allegations fail to plead scienter with particularity.

Plaintiffs raise a number of additional arguments purporting to provide circumstantial evidence of scienter during the Early Class Period. The Court considers each of these arguments in turn.

i. *STAAR's "History of Recalls" Is Irrelevant to a Determination of Scienter.*

In their Opposition to the Motion to Dismiss, Plaintiffs raise the new argument that STAAR's "history" of recalls and adverse events provides circumstantial evidence of scienter—an averment not raised in the CC. Opp'n at 4–5. To buttress this claim, Plaintiffs request judicial notice of (1) FDA Enforcement Reports related to STAAR recalls and (2) various printouts from the Manufacturer and User Facility Device Experience ("MAUDE") database maintained by the FDA's Center for Devices and Radiological Health. The MAUDE printouts detail all adverse events involving STAAR medical device products reported from 2001 through 2005. *See* Lead Pls.' Req. for Judicial Notice in Opp'n to Defs.' Mot. to Dismiss at 2. Plaintiffs contend that STAAR's knowledge of these recalls and incident reports provided it actual knowledge of "serious problems" with Its injector cartridges and lenses. Opp'n at 11. Thus, Plaintiffs argue that this knowledge rendered STAAR's statements concerning the timing of FDA approval and the promise of ICL technology false and misleading. *Id.*

First, the Court notes that both the information about the recalls and the MAUDE printouts were available through the FDA and thus were publicly known or available information. Thus, under the fraud-on-the-market theory,[10] "the market already had the necessary information to assess any impact of prior product recalls on FDA approval." Defs.' STAAR and David Bailey's Reply in Supp. of Mot. to Dismiss Pls.' Consolid. Class Action Compl. (hereinafter "Defs. Reply") at 1.

Even if judicial notice were given of these facts, which were not pled in the CC, Plaintiffs' evidence does not provide circumstantial evidence raising a strong inference of scienter. Drawing all reasonable inferences from all the allegations, it does not follow that STAAR *actually* knew

---

10. Plaintiffs rely on the fraud-on-the-market theory to plead the reliance element of their securities fraud claim. This theory is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic v. Levinson*, 485 U.S. at 241–242, 108 S.Ct. 978 (citing *Peil v. Speiser*, 806 F.2d 1154, 1160–1161 (3d Cir.1986)). Defendants do not contest this element of Plaintiffs' claim.

that the ICL was based on faulty technology with "serious problems," or that the ICL pre-market submission would be delayed or doomed to failure. On the contrary, the ICL fared well in a published clinical study; it was granted expedited review status by the FDA; and at the start of the Class Period, it had already received regulatory approval in several parts of the world, including the European Union and Canada. The Early Class Period allegations as a whole support an inference that, during the Early Class Period, Defendants in fact believed that the ICL was based on promising technology and believed that it would gain timely FDA approval. It does not support an inference of scienter during that portion of the Class Period.

The Court thus declines to take Plaintiffs' requested judicial notice of FDA enforcement reports and adverse incident reports inasmuch as this evidence is not relevant to a determination of scienter. Fed.R.Evid. 402. The FDA recall policies for which Plaintiffs request judicial notice are also irrelevant, as is STAAR's Form 8–K filed on July 11, 2005.[11] Accordingly, the Court declines to rule on Defendants' Opposition to Plaintiffs' Request for Judicial Notice inasmuch as the issue is moot.

ii. *The Insider Stock Sales Are Not Circumstantial Evidence of Scienter.*

▆▆▆ Plaintiffs further allege that several suspicious insider stock sales provide circumstantial evidence of scienter. Like all evidence of scienter, stock sales must meet the "strong inference" standard. *In re Daou Systems, Inc.,* 411 F.3d 1006, 1022 (9th Cir.2005) (amended 2005).

While insider trading in "suspicious amounts or at suspicious times" can be probative of bad faith and scienter, *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1117 (9th Cir.1989), the timing of insider trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed Inside information." *Silicon Graphics,* 183 F.3d at 986 (citing *Apple Computer,* 886 F.2d at 1117).

Plaintiffs allege that on May 28, 2003, Defendant Bailey sold 10,000 shares of STAAR stock for total proceeds of $116,470—and that "[t]he timing of this sale, following a series of positive announcements concerning ICL renders it suspicious." CC ¶48. Though Plaintiffs concede that Bailey only sold about 1% of his STAAR stock holdings, Mot. to Dismiss at 18, Opp'n at 12, they argue that this sale is "dramatically out of line with prior trading practices" because Bailey had not sold any shares of the Company's stock in the preceding two years, and because the stock sales followed a series of positive announcements.[12] Plaintiffs further aver that the stock was sold at more than twice the share price the day before the Class Period began two months earlier. Opp'n at 12. In addition, Plaintiffs point to STAAR director David R. Morrison's sale of 12,000 shares sometime during the Class Period, and STAAR officer Laurie Boyajian's sale of 1,000 shares on September 3, 2004.

Defendant Bailey's stock sale does not raise a strong inference of scienter. Officers of publicly traded companies commonly make stock transactions following

---

11. The July 11, 2005 Form 8–K references events exclusively outside of the Class Period and is also irrelevant to the determination of the Motion to Dismiss. Opp'n to Pls.' Req. for Judicial Notice at 4.

12. These announcements included Defendants' first quarter 2003 financial results, on May 1, 2003; an Inside Wall Street article, also on May 1, 2003; and the results of the favorable Cornea study on May 15, 2003.

the public release of quarterly earnings, such as STAAR's May 1, 2003 release of first quarter financial results. *Lipton v. Pathogenesis*, 284 F.3d 1027, 1037 (9th Cir.2002). The timing of the Bailey's lone stock sale is not "dramatically" out of line with previous trading practice. Furthermore, Plaintiffs' allegation regarding this stock sale does not raise the inference that Defendant Bailey's sale was "calculated to *maximize* the personal benefit from undisclosed inside information," *Silicon Graphics*, 183 F.3d at 986. STAAR stock ultimately reached as high as $14.17 a share at the close of the market on July 2, 2003. CC ¶ 50. A single sale, representing 1% of Defendant Bailey's holdings, which occurred months before STAAR stock reached its apex, does not fit this mold. *See Vantive*, 283 F.3d at 1093. In *Vantive*, the Ninth Circuit found that a corporate insider was not operating on "inside knowledge" where the price of his company's stock continued to increase for several months after he sold an overwhelming majority of his shares. Here, Defendant Bailey traded a minuscule proportion of his holdings, making an inference of scienter even less likely.

■ Plaintiffs do not allege that stock sales by director Morrison or officer Laurie Boyajian were in suspicious amounts, nor do they allege they were made at suspicious times. Plaintiffs do not even specify the date during the Class Period on which Morrison sold his stock. *See* CC ¶ 48, Opp'n at 12. Therefore, these facts as pled do not raise a strong inference of scienter.

iii. *STAAR's June 12, 2003 Private Placement of One Million Shares of Common Stock Is Not Circumstantial Evidence of Scienter.*

■ Plaintiffs further allege that Defendant STAAR "relied on its inflated share price to complete a private place-

ment of 1,000,000 shares of the Company's Common Stock" on June 12, 2003, and that "[t]his sum was critical in allowing the company to meet its aim of achieving FDA final approval of its ICL's." CC ¶¶ 83, 84. Plaintiffs argue that Defendants' actions in obtaining "critically needed funding" was fraudulent, CC ¶ 84, and that it provided circumstantial evidence of scienter as well as of "motive and opportunity." Opp'n at 11.

Plaintiffs observe that a desire to raise company financing can be probative of a motive to defraud investors. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir.2000). However, *Everex* held only that the desire to raise company financing, combined with "the red flags of [a defendant corporation's] financial condition," can be sufficient to withstand a motion for summary judgment. *Id.; accord Vantive*, 283 F.3d at 1097. *Everex* did not apply the more stringent pleading standard under the PSLRA; what is sufficient to avoid summary judgment under *Everex* is not necessarily sufficient to avoid a motion to dismiss under the PSLRA. *Vantive*, 283 F.3d at 1097 (discussing *Everex*, 228 F.3d at 1064).

Furthermore, Plaintiffs have not pled with particularity any facts that substantiate their allegation that the Company was in "desperate need of financing." Opp'n at 12. They aver only that STAAR's Chief Financial Officer stated, in a May 1, 2003 conference call, that "cash constraints" were limiting the pace at which new surgeons could be trained in the ICL; and that Defendant Bailey later acknowledged that the private placement "allowed us to strengthen our financial platform tremendously." CC ¶ 84. But if scienter could be pleaded merely by alleging that officers and directors possess such motive and opportunity to enhance a company's business prospects, "virtually every company In the

United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Pathogenesis*, 284 F.3d at 1038 (quoting *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

### iv. *STAAR's Failure to Update Forward–Looking Statements is Irrelevant to Scienter.*

 Finally, Plaintiffs allege that Defendants' failure to update their ICL representations is further circumstantial evidence of scienter. However, the PSLRA emphasizes that it imposes no obligation to update forward-looking statements. 15 U.S.C. § 78u–5(d) ("Nothing in this section shall impose a duty to update a forward-looking statement.") In addition, STAAR's press releases expressly noted that STAAR did not intend to update its forward-looking statements. *See, e.g.,* May 1, 2003 press release, RJN Ex. 4 at 95. The Court does not find that Defendants' failure to update their forward-looking statements raises the requisite "strong inference" of scienter.

### c. *Defendants' Statements from September 4, 2003 through January 20, 2004 Demonstrate Scienter.*

Plaintiffs allege that various statements made by Defendants after September 4, 2003, the date on which Defendants received the FDA's Form 483 Notice of Observations, were false and misleading.[13] These statements omitted mention of the Form 483 and any of the "significant objectionable conditions" noted in the Form that could potentially delay FDA approval of the ICL.[14] Plaintiffs assert that Defendant Bailey's statements in an Oct. 6, 2003

press release ("We are extremely pleased with the panel's recommendation and vote of confidence and look forward to working with the FDA staff to complete the review of the ICL"; "We look forward to the commercialization of the ICL in the U.S.") were false and misleading for this reason. CC ¶ 57.

Plaintiffs also point to similar statements by Bailey in an Oct. 9, 2003 press release; an Oct. 9, 2003 conference call; and an Oct. 30, 2003 press release. CC ¶¶ 57, 58. Most importantly, Plaintiffs emphasize allegedly false and misleading statements made by Defendants during a conference call on Oct. 30, 2003.

### i. *The Omission of the Notice of Observations and Problems Observed Within Material.*

 To be actionable, Rule 10b–5 requires that a statement involve a "material" fact, the omission of which makes that statement misleading "in light of the circumstances under which they were made." 17 C.F.R. § 240.10b–5. The facts related to the issuance of the Form 483 and the problems described therein were "material" because there was a "substantial likelihood" that disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available to him. *Basic*, 485 U.S. at 231–232, 108 S.Ct. 978. Any facts bearing on possible delays in FDA approval of the ICL are thus material because STAAR's entire strategy depended on the timely approval and commercial launch of the ICL. *See* The Wall Street Transcript (TWST) article, RJN Ex. 1 at 14 ("We believe that STAAR will be a credible first entrant into this new

---

**13.** The period from September 4, 2003 through January 20, 2004 (the end of the Class Period) will be referred to as the "Later Class Period."

**14.** While the Form 483 itself is not in evidence, Defendants do not argue that the issues noted in the FDA's Form 483 are any different from those later revealed in the FDA's Dec. 23, 2004 Warning Letter.

**1130**

product category and with a 12 to 18 month regulatory lead in the U.S. we expect rapid uptake of the ICL and surgeon loyalty thereafter"). The fact that Defendants actively responded to the Form 483 and/or considered the compliance problems to be minor is irrelevant.

ii. *Defendants' Forward–Looking Statements on October 6, 2003, October 9, 2003 and October 30, 2003 Were Misleading and Made with Actual Knowledge of Their Falsity.*

 With regard to Defendants' forward-looking statements in the October 6, 2003 press release, the October 9, 2003 press release and conference call and the October 30, 2003 press release, Plaintiffs have demonstrated a strong inference of "actual knowledge" that their forward-looking statements were false or misleading when made. 15 U.S.C. § 78u–5(c)(1)(B)(i). Because of its receipt of the FDA's Form 483 in September 2003, STAAR had *actual* knowledge of potential problems with its compliance with FDA CGMP and Quality System regulations.

Defendants understood that the Aug. 2003 inspection of the Monrovia facility was "[i]n connection with the [ICL] application," Mot. to Dismiss at 2. Furthermore, while Defendants note that the Form 483 did not represent a final FDA determination regarding STAAR's compliance, Mot. to Dismiss at 3, the nature of those problems (*e.g.*, failure to report serious injuries and other incidents attributed to STAAR products, and failure to perform "root cause analysis" for incident reports) raises a strong inference that STAAR had actual knowledge that these problems could delay or jeopardize the ICL's approval. *See* FDA Warning Letter dated Dec. 22, 2003, RJN Exhibit 14 at 255–256. Defendants may not claim that they were surprised by FDA's Dec. 2003 Warning Letter stating that "no premarket submissions for Class III devices to which the

Quality System regulation deficiencies are reasonably related will be cleared until the violations have been corrected," RJN Ex. 14 at 256.

 In addition, Defendants' statements during this time period were misleading "in light of the circumstances under which they were made." 17 C.F.R. § 240.10b–5. Because STAAR's ICL business strategy required prompt FDA approval of the ICL device, Defendant Bailey's statements anticipating "the commercialization of the ICL in the U.S." implied a *timely* commercialization of the ICL in the U.S., with FDA approval by the end of 2003 and a U.S. market launch in early 2004. These statements necessarily Implied that there would be no serious impediments to timely FDA approval. Thus, Defendants' omission of facts suggesting a possible delay in approval was misleading.

 Defendants claim that Plaintiffs must show Defendants "*knew* that the FDA would find STAAR's September 29, 2003 written response inadequate, *knew* that the FDA would ultimately issue a Warning Letter, and *knew* that the Warning Letter would state that the FDA would not approve any new STAAR devices until STAAR's 'quality system' deficiencies were corrected." Mot. to Dismiss at 10 (emphasis in original).

 However, Defendants attempt to raise the standard for scienter far beyond what is required by the PSLRA. Although the PSLRA was enacted to end the practice of pleading "fraud by hindsight," *Silicon Graphics*, 183 F.3d at 988, the PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future. It requires only that Plaintiffs plead facts raising a strong inference that Defendants' forward-looking statements be made with "actual knowledge" of their falsity. 15 U.S.C. § 78u–5. Plaintiffs have satisfied that standard here.

iii. *Defendants' October 30, 2003 Conference Call Statements, Which Are Not Forward-looking, Demonstrate the Requisite Scienter of Deliberate Recklessness.*

■ Plaintiffs assert Defendant Bailey and officers of Defendant STAAR made their most misleading statements to investors in an Oct. 30, 2003 conference call. CC ¶¶ 61–62. During this call, an analyst asked what issues remained to be resolved in order to attain FDA approval of the ICL. Transcript of Oct. 30, 2003 Conference Call, STAAR Form 8–K filed Nov. 5, 2003 Ex. 99.2, RJN Ex. 13 at 209, 247. Chief Scientific Officer Helene Lamielle responded that "[t]he main element remaining with FDA is the labeling discussion" and that "we do not expect lots of difficulty or issues." *Id.* She also acknowledged that several manufacturing audits had taken place and asserted they were in the "final stage of finalization." *Id.* Furthermore, in response to direct questioning on whether there were any problems with manufacturing or GMP's that could hold up FDA approval, Ms. Lamielle responded that "I think that everything will work in conjunction, and we do not expect huge issues with these elements." *Id.* Defendant Bailey agreed with Ms. Lamielle's assessment, adding that "I can't imagine [the labeling issues will be] more challenging than the [FDA] panel meeting" and "I have total faith in Helene and the FDA to work any issues through." *Id.*

Science Officer Lamielle's indirect statements suggesting that CGMP or manufacturing problems would not delay approval of the ICL are *not* forward looking statements, and hence are not subject to the higher standard for scienter under the PSLRA. These statements, as well as Defendant Bailey's statements concerning labeling, convey a sense of the current state of the ICL's FDA pre-market submission and are not "plans or objectives relating to the products or services" of STAAR. 15 U.S.C. § 78u–5(i) (relevant definition of "forward looking statement"). Thus, the required scienter is, at a minimum, deliberate recklessness, rather than actual knowledge. *See Silicon Graphics*, 183 F.3d at 977.

■ The allegations concerning Defendant Bailey and STAAR Chief Science Officer Lamielle's statements during the Oct. 30, 2003 conference call satisfy both the "deliberate recklessness" or "actual knowledge" standards for scienter. The "deliberate recklessness" standard involves "some degree of intentional or conscious misconduct," *Silicon Graphics*, 183 F.3d at 977 (discussing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)), which requires less than demonstrating "actual knowledge" of falsity. Here, Defendants *actually* knew of the Form 483, the problems noted in the Form 483, and their possible implications for approval of the ICL. Because Plaintiffs plead facts giving rise to a strong inference of actual knowledge that Defendants knew that their statements were false when they were made, they also demonstrate "deliberate recklessness" on Defendants' part.

In light of the circumstances in which they were made, Defendants' alleged omission of facts relating to the Form 483 and the Quality System, CGMP, and MDR problems in that Form were false and misleading. STAAR Science Officer Lamielle[15] and Defendant Bailey responded to

---

15. Ms. Lamielle's statements were made with scienter and in her capacity as an employee of STAAR. In addition, they were made with the approval of Defendant Bailey. *See* Transcript of Oct. 30, 2003 conference call, RJN Ex. 13 at 247 ("I have total faith in Helene and the FDA to work any issues through.")

direct questions about whether any factors, such as CGMP's, could delay FDA approval, by assuring investors that the main remaining issue was "the labeling discussion," that they did not "expect huge issues," and that audits were in the "final stage of finalization." CC ¶ 61; RJN Ex. 13 at 247. Defendants' assertion that Plaintiffs "do not allege any facts suggesting that STAAR knew that its September 29, 2003 response to the Notice of Observations would be deemed inadequate, or that STAAR actually 'expect[ed] huge issues' with the finalization of the earlier audit," Mot. to Dismiss at 12, fails to address this point. The allegations suggest that STAAR may have believed or hoped that the Issues raised in the Form 483 would not pose a serious problem to FDA approval. Nevertheless, Defendants' failure to mention those issues in their statements responding to direct questioning about potential obstacles to FDA approval raises a strong inference that those statements were made with actual knowledge of their falsity.

iv. *Plaintiffs Fail to Show STAAR's January 7, 2004 Press Release Is Actionable.*

 Lastly, Plaintiffs argue that STAAR's Jan. 7, 2004 press release regarding the FDA's December 22, 2003 warning letter contained misleading statements for another reason. CC ¶ 69. They argue that statements in this press release were false and misleading because "defendants never informed investors of [a] second audit which took place in early Dec. 2003." *Id.* Regardless of whether this omission was material and misleading, it is not actionable. As Defendants argue, Plaintiffs fail to demonstrate an economic loss resulting from this omission during the Class Period. *See Dura Pharmaceuticals, Inc. v. Broudo,* — U.S. —, —, 125 S.Ct. 1627, 1633, 161 L.Ed.2d 577 (2005) (economic loss is a basic element of

a securities fraud action). Plaintiffs do not contest this argument. Thus, statements contained in the Jan. 7, 2004 press release are not probative of scienter.

4. *Plaintiffs Sufficiently Allege the Element of "Loss Causation"*

 Defendants assert that Plaintiffs have not sufficiently alleged the element of "loss causation." The PSLRA requires that "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). *Accord Dura Pharmaceuticals,* 125 S.Ct. at 1633. Defendants note *Dura Pharmaceuticals'* holding that a plaintiff may not prove "loss causation" simply by alleging that he purchased securities at "artificially inflated" prices. *Dura Pharmaceuticals,* 125 S.Ct. at 1634. However, the Ninth Circuit has held that a plaintiff sufficiently pleads "loss causation" by alleging that there was a steep drop in defendants' stock price upon revelation by defendants of previously undisclosed facts. *In re Daou Systems, Inc.,* 411 F.3d 1006, 1026 (9th Cir.2005).

Plaintiffs here have alleged that on Jan. 6, 2004, STAAR's share price declined 18% upon revelation of the FDA's Dec. 22, 2003 Warning Letter, which made known previously undisclosed problems with Defendants' manufacturing facilities. CC ¶¶ 66–67. Thus, under *Daou,* Plaintiffs sufficiently allege that Defendants' alleged misrepresentations and omissions proximately caused their economic losses.

For the reasons above, Defendants' Motion to Dismiss Plaintiffs' § 10(b) claim is DENIED. However, Plaintiffs may base their § 10(b) claim only on statements made during the October 6, 2003, October 9, 2003 and October 30, 2003 press releases and conference calls during the Later Class Period. All other allegations made

in the Later Class Period, including allegations concerning the statements made in the January 7, 2004 press release, shall be STRICKEN from the Consolidated Complaint as identified in this Order.

### B. *Plaintiffs State a Claim Under § 20(b) of the Exchange Act.*

■ Defendants contest Plaintiffs' "control person" liability claim against Defendant David Bailey under § 20 of the Exchange Act only on the grounds that there is no "primary liability" against Defendant STAAR. However, Plaintiffs sufficiently allege a "primary" violation of securities laws.

■ Section 20 of the Securities Exchange Act extends joint and several liability to "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Thus, a plaintiff must show (1) a primary violation of the federal securities laws, and (2) that the defendant "directly or indirectly" controlled the violator. *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). To satisfy the latter element, a plaintiff must allege that "defendants exercised 'a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations.'" *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1277 (N.D.Cal.2000).

Plaintiffs allege that David Bailey exercised a significant degree of day-to-day control over the Company. CC ¶ 14. For instance, Bailey stated in an interview that, "[i]n terms of strategic direction, [we] set about making the company more efficient and effective in its execution, [by] critically changing the balance of revenues from being dependent on the cataract business to being much more dependent on the higher margin refractive and glaucoma surgical products." TWST, March 17, 2003, CC ¶ 33, RJN Ex. 1 at 10. This statement is indicative of Defendant Bailey's degree of operational control over STAAR, amounting to the power to control the Company's operations. *See also* CC ¶¶ 100–102.

## IV. CONCLUSION

For the reasons above, Defendants' Motion to Dismiss under 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure is DENIED. However, Plaintiffs may base their § 10(b) claim only upon those allegations from the Later Class Period which raise a strong inference of scienter: (1) Defendants' forward-looking statements contained in the October 6, 2003 press release, the October 9, 2003 press release and conference call and the October 30, 2003 press release; and (2) Defendants' statements in the October 30, 2003 conference call concerning the status of FDA approval of the ICL. All other Later Class Period allegations, including allegations concerning the statements made in the January 7, 2004 press release, ARE STRICKEN from the Consolidated Complaint. In addition, Plaintiffs' Early Class Period allegations ARE STRICKEN from the Consolidated Complaint.

Defendants have fifteen (15) days from the date of this Order to answer the remaining allegations.

IT IS SO ORDERED.